UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>PEDRO CASTANEDA-SANTANA,<br><br>      Defendant. | NO.: 20-CR-54 (PJS/ECW)<br><br>**DEFENDANT PEDRO CASTANEDA-SANTANA POSITION ON SENTENCING** |

## INTRODUCTION

Defendant, Pedro Castaneda-Santana, is before the Court awaiting sentencing after having pled guilty to Count 1 of the Second Superseding Indictment which charged Conspiracy to Distribute 50 grams or More of Actual Methamphetamine in violation of 21 USC 841(a)(l), b(1)(A), 846.  The Presentence Report ("PSR") assigns Mr. Castaneda-Santana a total offense level of 27, a criminal history category of I, resulting in a sentencing guidelines range of 70-87 months.   Mr. Castaneda-Santana moves for a downward variance based on the factors set forth in 18 USC 3553(a).  He respectfully asks the Court for a 30-month prison sentence.

## THE BACKGROUND OF PEDRO CASTANEDA-SANTANA

Pedro Castaneda-Santana is a 36-year-old naturalized citizen.  He was born in Nayarit, Mexico, in 1985.  At age two, Mr. Castaneda-Santana immigrated to California with his parents.  His father was a migrant farm worker.  When Pedro was eight years old his parents separated (PSR ¶ 48). Pedro then moved to Minnesota with his mother and young brother, Orlando, to escape the danger of their Los Angeles neighborhood (PSR ¶¶

48, 52).  In Minnesota, Pedro's mother worked several jobs to support her young family. As a single parent she provided a modest living for her young family without government assistance (PSR ¶ 49).  Pedro was responsible for getting himself and his brother ready and off to school.  As a young teenager Pedro began working and contributed the majority of his paycheck to his mother for their living expenses (PSR ¶ 49).  Pedro did not graduate with his class in 2004, but returned to Hopkins High School in 2005 to finish necessary classes and achieved his diploma in 2006 (PSR ¶ 59).

Since his part-time jobs in high school, Pedro has been gainfully employed.  From 2006 through the present, Pedro has worked at Bed Both and Beyond in Minnetonka.  In addition, he helps his brother, an Amazon delivery man, a few nights per week (PSR ¶¶ 61 and 62).

The closeness to family that Pedro experienced growing up with his single mother and young brother carried forward as he became an adult.  In 2014, Pedro married his high school girlfriend, and they had a daughter, Genesis.  He too became a single parent in 2017 when he and his wife separated.  His wife developed another relationship and had another child (PSR ¶ 51).  Pedro became the primary caretaker of Genesis, living together in their one-bedroom apartment in Hopkins.  He has consistently not only been a great father, but a present and loving uncle to his brother's children (PSR ¶ 52).

In 2019, Pedro made a stupid mistake that he will regret forever.  He agreed to do a simple transfer of drugs for cash for a man he knew, to quickly make a few hundred dollars.

**ARGUMENT**

In determining a defendant's sentence, a court must first determine the appropriate sentencing guidelines range. *Gall v. United States*, 128 S.Ct. 586, 596 (2007) (citing *Rita v. United States,* 127 S. Ct. 2456 (2007)).  "The Guidelines are not the only consideration, however."  *Id.*  After the Court determines the guideline range, it considers all of the factors set forth in 18 U.S.C. § 3553(a) including: the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the guideline range, any relevant policy statement and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  18 U.S.C. §3553(a).  The Court must impose a sentence that is sufficient but not greater than necessary in light of these factors.  A consideration of these factors compels the conclusion that a sentence significantly below the guideline range is appropriate in this case.

"The Guidelines are not only not mandatory on sentencing courts; they are also *not* to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (emphasis added).  The Eighth Circuit Court of Appeals has provided further guidance, "[w]e may not require "'extraordinary' circumstances to justify a sentence outside the Guidelines." *United States v. Feemster*, 572 F.3d 455, 462 (8th Cir. 2009) (quoting *Gall*, 128 S. Ct. at 595).  Instead, the district court must "make an individualized assessment

3

based on the facts presented." *Gall*, 128 S. Ct. at 598.  The district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. Bridges*, 569 F.3d 374, 379 (8th Cir. 2009); *see also United States v. Chaika*, 695 F.3d 741, 746 (8th Cir. 2012).

### A.    Acceptance of Responsibility

Pedro Castaneda-Santana takes full responsibility for his crime.  He has assisted authorities in the investigation of his own misconduct by timely notifying them of his intention to plead guilty (PSR  ¶ 35).  He completed a truthful safety-valve proffer   (PSR ¶ 28).  During his 16 months on conditional release he complied with all conditions, maintained gainful employment and submitted all negative drug tests (PSR ¶ 11).

### B.    Pedro Castaneda-Santana's  Personal History and Characteristics Strongly Support a Downward Variance.

Pedro has demonstrated dedication to his family and hard work.  His scrapes with the law before this incident were minor and learning experiences for him.  He came to Minnesota without an understanding of the English language and a new culture.  He set out to learn and succeeded by becoming a productive member of this new culture.  He has always been self-supporting for himself and his family.  For years Pedro has been a dedicated single parent raising his daughter, Genesis.  Today, she is 14 years old.

The Eighth Circuit affirmed a downward variance to probation where the district court found that a prison sentence would negatively affect the defendant's young son with disabilities.  *United States v Lehmann,* 513 F3d 805 (8th Cir. 2008).  In *United States v Cox,* 271 F. Supp. 3rd 1085, 1087, the court granted a downward variance after

considering the defendant's minor children in the section 3553(a) analysis, and concluding that to fashion a sentence "sufficient, but not greater than necessary" under the statute, "*the welfare of a defendant's children must be fully considered*" (emphasis added).

### C.    Role in the Offense

As the PSR correctly points out, the parties waived Chapter 3 adjustments other than Acceptance of Responsibility. Though having waived claims for a mitigating role adjustment, Pedro's lesser involvement in the grand scheme of the conspiracy is pertinent to his request for a downward variance.

Application note 3(C) to Sec. 3B1.2 suggest factors to consider in determining whether to apply a mitigating role adjustment:

> "(i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (v) the degree to which the defendant stood to benefit from the criminal activity."

Here, Pedro had a connection with only one of the other nine members of the conspiracy (PSR ¶ 16). On two occasions, Pedro's sole role was to carry an already determined amount of drugs from his apartment to a car in the apartment's parking lot to a recipient he did not know. The deal had been solicited, negotiated, and arranged by others. Others had acquired and financed the drugs. Pedro had no involvement in planning or organizing the activity. He exercised no decision-making authority.

Consistently, the Eighth Circuit has upheld the trial court's denial of mitigating role adjustments. "Merely showing the defendant was less culpable than other participants is not enough to entitle the defendant to the adjustment if the defendant was 'deeply involved' in the offense." *United States v Bush*, 352 F3d 1177,1182 (8th Cir. 2003). See also *United States v Cubillos*, 474 F3d 1114, 1120 (8th Cir. 2007). But Pedro was a lesser participant in this drug conspiracy. He wasn't "deeply involved." District courts throughout the country have found that "the drug trafficking guidelines suffer from an "over-emphasis on quantity" and "under-emphasis on role in the offense. (*See Cabrera*, 567 F. Supp. 2d at 275; *Hayes*, 948 F. Supp. 2d at 1027, "The methamphetamine offense Guidelines are excessive because they subject all defendants to harsh treatment, regardless of their role in the offense.") *Diaz*, 2013 U.S. Dist. LEXIS 11386, 2013 WL 322243, at *2 (recommending that the drug trafficking Guidelines be "more sensitive to factors directly relevant to culpability, including the defendant's role in the offense, and less sensitive to drug type and quantity").

> **D.     A Variance Is Warranted Because of the Drug Offense Guideline is Arbitrary, Resulting in Unwarranted Sentencing Disparities in Methamphetamine Offenses.**

The application of USSG §2D1.1 is not consistent with the § 3553(a) factors and would result in an unwarranted sentencing disparity here. The Court has the discretion to consider a downward variance where, as here, the Sentencing Commission did not base a guideline on empirical data, but rather statutory directives. Sentencing courts may vary from the applicable Guidelines ranges based on their disagreement with a Guidelines policy. *See United States v. Kimbrough*, 552 U.S. 85, 109-10 (2007); *see also United*

*States v. Irey*, 612 F.3d 1160, 1212 (11th Cir. 2010) *("Kimbrough* allows a district court to vary from the Guidelines based solely on its judgement that the polices behind the guidelines are wrong.");  *United States v. Flores-Perez*, 749 Fed. Appx. 793, 2018 WL 4293305, at \*4 (11th Cir. 2018) (unpublished) (noting that *Kimbrough* "'empowered' district courts with discretion to vary downward based on a policy disagreement with the applicable guidelines"); *see also Pepper v. United States*, 562 U.S. 476, 501 (2011) ("[A] district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views.").  USSG §2D1.1 is not grounded in empirical data.  As the United States Supreme Court explained.  The Commission did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses. Instead, it employed the 1986 Act's weight-driven scheme.  The Guidelines use a drug quantity table based on drug type and weight to set base offense levels for drug-trafficking offenses.  *Kimbrough*, 552 U.S. at 96.  In the 1986 Anti-Drug Abuse Act "Congress sought 'to link the ten-year mandatory minimum trafficking prison term to major drug dealers and to link the five-year minimum term to serious traffickers.'" *Id.* (citing United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy iv (May 2002)).  The 1986 Act used the weight (and thus quantity) of the drugs involved in the offenses "as the sole proxy to identify 'major' and 'serious' dealers." *Id.*

However, "[s]ome observers doubted that drug quantity was a reliable measure of offense seriousness," especially "for the culpability of low-level offenders, who may have contact with significant amounts of drugs, but who do not share in the profits or decision-

making," United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 49-50 (2004) (citing Catherine M. Goodwin, *Sentencing Narcotics Cases Where Drug Amount is a Poor Indicator of Relative Culpability*, 4 Fed. Sentencing Rep. 226 (1992); Steven B. Wasserman, *Toward Sentencing Reform for Drug Couriers*, 61 Brook. L. Rev. 643 (1995)).  Given "the problems with relying on drug type and quantity to measure the seriousness" of drug crimes, critics "called for a fundamental re-examination of the role of quantity under the guidelines." *Id.* at 52 (citing Frank O. Bowman III, *The Quality of Mercy Must Be Restrained, and Other Lessons in Learning to Love the Federal Sentencing Guidelines*, 1996 Wis. L. Rev. 679 (1996); Jonathan P. Caulkins et al., *Mandatory Minimum Drug Sentences: Throwing Away the Key or the Taxpayers' Money?* (RAND 1997)).

Courts have increasingly recognized that "'drug quantity is a poor proxy for culpability.'"  *United States v. Johnson*, 379 F. Supp. 3d 1213, 1220 (D. Ala. 2019); *United States v. Diaz*, 2013 U.S. Dist. LEXIS 11386, 2013 WL322243, at *13; *see also United States v. Cabrera*, 567 F.Supp. 2d at 271, 276-77 (D. Mass 2008; *United States v. Woody*, 2010 U.S. Dist. LEXIS 72909, 2010 WL 2884918,at *9 (D. Neb. July 20, 2010) (in drug conspiracy cases, quantity "is not always a trustworthy measure of the culpability of an individual defendant").  As the district court in *Diaz* recognized, "Drug quantity is not irrelevant in assessing a drug trafficking defendant's culpability, and there is nothing inherently wrong with the Guidelines taking drug quantity into account.  If all else is equal, a dealer who sells 50 kilograms of heroin

8

inflicts more harm on society, and deserves greater punishment, than one who sells one kilogram." *Diaz*, 2013 U.S. Dist. LEXIS 11386,2013 WI 322243, at *12. However, "two drug trafficking cases are rarely alike in all respects except quantity." *Id.* Many "factors distinguish one drug offender's culpability from another," including his compensation, whether he had a proprietary interest in the drugs, the length of his involvement in the trafficking, and his reasons for getting involved and for stopping. *Id.* Perhaps above all else, the most important factor distinguishing the culpability of defendants is their role in the crime. As the district court explained in *Diaz*, the "managers and leaders of a drug organization actively plan the organization's activities, plot to increase its profits, and recruit its members." *Id.* Consequently, they are more likely to initiate drug-related crimes and increase their scale. A low-level dealer or courier, by contrast, "is easily replaceable and does little to advance the overall drug organization." *Id.*

Pedro was a low-level courier, at best. District courts throughout the country have found that "the drug trafficking guidelines suffer from an "over-emphasis on quantity" and "under-emphasis on role in the offense. (*See Cabrera*, 567 F. Supp.2d at 275; *Hayes*, 948 F. Supp.2d at 1027, "The methamphetamine offense Guidelines are excessive because they subject all defendants to harsh treatment, regardless of their role in the offense.") *Diaz*, 2013 U.S. Dist. LEXIS 11386, 2013 WL 322243, at *2 (recommending that the drug trafficking Guidelines be "more sensitive to factors directly relevant to culpability, including the defendant's role in the offense, and less sensitive to drug type and quantity").

The guideline should also be given less weight because of its emphasis on methamphetamine purity.  The current sentencing guidelines disparities between methamphetamine mixtures and pure methamphetamine are not grounded in empirical study and national experience.  *Ferguson*, 2018 WL 3682509 at *2-*3; *See also United States v. Kehler*, No. CR 17-196 (DWF/DTS) (D. Minn. Aug. 22, 2018); *United States v. Thielen*, No. CR 17-247(2) (PAM/SER) (D. Minn. Dec. 17, 2018); *United States v. Norwood*, No. CR 18-152 (JNE/SER) (D. Minn. Feb. 22, 2019); *United States v. Quallate*, No. CR 18-223 (PJS/ECW) (D. Minn. Mar. 7, 2019); *United States v. Heisler*, No. CR 18-115 (PJS/LIB) (D. Minn. Jan. 31, 2019).  Under these circumstances, the guidelines range fail to achieve 3553(a)'s sentencing objectives.  *Kimbrough*, 552 U.S. at 109.  Accordingly, the Court has the authority to vary downward based on a policy disagreement with the Guidelines ranges for actual/pure methamphetamine offenses, such as Mr. Castaneda-Santana's offense.

The methamphetamine guidelines overemphasize drug quantity and purity, which are not  accurate proxies for Mr. Castaneda-Santana's role or culpability.  This compels a substantial downward variance from the guideline range.

The recent sentencing data suggests that courts are recognizing that the suggested guideline sentence recommendations are too high.  As set forth in the PSR at ¶ 70:

> "During the last five fiscal years (FY2017-2021), there were 2,519 offenders whose primary guideline was Sec. 2D1.1 and Methamphetamine (actual) was the primary drug type, with a Final Offense Level of 27 and a Criminal History Category of I, after excluding offenders who received a 5K1.1 substantial assistance departure.  For the 2,488 offenders (99%) who received a sentence of imprisonment in whole or in part, the average length

10

of imprisonment imposed was 37 months and the median length of imprisonment was 33 months."

## CONCLUSION

Based on the factors set forth in 18 U.S.C. §3553(a), particularly his background, his dedication to family, and his prospects for continued valuable contributions to society, Mr. Castaneda-Santana asks the Court to sentence him to 30 months imprisonment.

Respectfully submitted,

**WOLD MORRISON LAW**

Dated:   May 25, 2022.

 s/ Peter B. Wold
Peter B. Wold, ID#118382
TriTech Center, Suite 705
331 Second Avenue S
Minneapolis, MN  55401
Telephone:  612.341.2525
Facsimile:   612.341.0116